We move now to the fifth case, Bukola Omowole v. Monty Wilkinson. Mr. Kante. Thank you, Your Honor. How are you, Judge? May it please the Court, my name is Soare Kante. I represent Ms. Bukola Omowole, the petitioner in this case. We respectfully submit to the Court, Your Honor, that the findings by the Board of Immigration Appeals and the immigration judge that Ms. Omowole is removable from the United States is not supported by reasonable, substantial, and probative evidence. This case is based solely on the immigration judge's adverse credibility determination. We understand that this Court is reticent, reluctant to disturb an immigration judge's adverse credibility findings as long as it is supported by specific cogent reasons that bear a legitimate nexus to the findings. In this case, however, we do not believe that is the case because the adverse credibility finding is based solely or substantially on unreliable and coerced testimony provided by Ms. Omowole's husband during his attempt to obtain U.S. citizenship. This started in an application for naturalization of USCIS in Sacramento, California. This application was referred for a second layer of investigation by the Fraud Detection Unit of the USCIS Office in Sacramento. The case was assigned to one Officer Salih, Nail Salih. Once Officer Salih took over Mr. Omowole's file, things began to go down here. On February 22, 2013, Officer Salih interviewed Mr. Omowole for almost three hours. During this period, Officer Salih confronted Mr. Omowole, indicating that his marriage to Ms. Omowole must have been a fraudulent marriage. Mr. Omowole denied the allegation right from the outset. However, during this period, Officer Salih threatened, coerced, and forced Mr. Omowole to produce testimony that was consistent with what his belief was, that the marriage was a fraudulent marriage. He threatened to deport Mr. Omowole. He threatened to revoke Mr. Omowole's permanent residence status. He said that two petitions that Mr. Omowole had filed on behalf of his current wife and child would be denied unless he agreed that Mr. Omowole's marriage to Ms. Omowole was fraudulent. After several hours of brawling, Mr. Omowole relented and agreed that his marriage to Ms. Omowole was a fraudulent marriage. During the proceedings before the immigration judge, Mr. Omowole recanted the statement that he made before Officer Salih. In fact, however, in the decision, the immigration judge accepted Mr. Officer Salih's testimony, book, line, and sinker. But in the decision, in the government's brief, they indicated that the decision of the board is supported and relied mainly on an affidavit that was signed by Mr. Omowole during his appearance before Officer May Salih. Well, that affidavit was a pre-written document in which Mr. Omowole was required to fill in the blanks. Now, if someone has been in the United States, in order to deport Mr. Omowole from this country, the government has to come forward with a document more than what they presented to the court. That document I would call the court's attention to is very defective in many respects. As I indicated, it was a pre-written document where Mr. Omowole was required to fill in the blanks. In fact, as to the question regarding whether Mr. Omowole had paid money, was paid money to include Mr. Omowole in his visa application, he was forced to write that he received $1,200 as a visa fee. The government knows there is no $1,200 visa fee at the U.S. Embassy in any country. So that starts to point to the problems with the document. Then, it also indicated, it asked whether or not the marriage was consummated, the marriage between Mr. Omowole and Ms. Omowole was consummated. The word consummated appears before the word sexual relations. According to Mr. Omowole's own lawyer, who is in San Francisco, Mr. Omowole did not understand what the word consummated was. Then, at the end of the affidavit, there were seven questions on that affidavit. At the end of the affidavit, Mr. Omowole was asked to write a statement in his own words, why he married Ms. Omowole. He wrote, I don't know why, but end statement. There was no discussion by Mr. Omowole with his own words as to why he got married to Ms. Omowole. In fact, during his three hours in irrigation by Officer Serling, he repeated several times that his marriage was a bona fide marriage, his marriage to Ms. Omowole, until he got threatened with deportation. In fact, the immigration judge himself during the hearing recognized that. On page 327 of the transcript, he indicated that he believed that he asked counsel for government to respond whether or not the Officer Serling had even crossed the line. The government did not produce any substantial or substantive response to the question by the immigration judge. In the testimony though, in the decision though, none of that, the browbeating testimony that was recovered from Mr. Omowole was not discussing any of the decisions, not the decision by the Board of Immigration Appeals and not the decision by the immigration judge. This court has indicated when it comes to credibility findings, even if the decision is supported by specific and cogent reasons, the immigration judge must consider explanations offered for gaps and inconsistencies. That's stated in the case of Santosh Mikov v. Lynn, 834, Federal Authority, 836. It's a 2016 decision by this court. The court, the immigration judge and the Board of Immigration Appeals completely failed to consider the explanations that Mr. Omowole provided, indicating that, in fact, his testimony that he's married to Ms. Omowole was fraudulent, was coerced, and he made those statements under duress. Now, obviously- Mr. Contra, do you know if Justice Omowole is still in the middle of the proceeding? In fact, the record indicates that he was no longer in removal proceedings, and the two petitions that he fired, contrary to what Officer Saley said, were approved, and his current wife is currently in the United States, as well as his son that he applied for. So they are both- all of them are here, except Ms. Omowole is the one that is facing deportation, even though the beginning, the genesis of this case, was an application for naturalization that Mr. Omowole filed in San Francisco. The affidavit is very suspect, Your Honor. I don't think this court can accept this affidavit as a substantial document that would support the deportation of Ms. Omowole. Now, one more issue in this case is whether or not Ms. Omowole provided substantial documentation to show that her marriage to Mr. Omowole was a bona fide marriage. Well, this case came up about 10 years after this couple had been- their marriage had been defunct. They were divorced, they came into the United States separately in 2007, and they barely lived together. They actually lived together for less than a year while they were in Nigeria. Where were they supposed to get these documents to support a bona fide marriage? Now, the government says no explanation was provided for that. Indeed it was. We explained that, in fact, it's been too long since they were married. They never lived together in the United States as a couple, and so they cannot reasonably provide bank statements, tax returns, and documents like that. And the board itself has said that failure to produce such documents, affirmative documents, does not indicate that a marriage is a fraudulent marriage. I see that my time is up. Your Honor, we ask that you reverse the decision of the board for immigration appeals. Thank you, Mr. Justice. Ms. Browning? Thank you, Your Honor. May it please the court, Rachel Browning for the U.S. Attorney General. In this case, the agency properly concluded that petitioner is removable for having procured admission by fraud or willfully misrepresenting a material fact because the record evidence amply supports the agency's finding that her prior marriage was not valid and was entered into solely for procuring admission to the United States. In assessing the validity of the marriage, the issue is whether petitioner and her former husband intended to establish a life together at the time that they were married. And the couple's conduct before and after the marriage is relevant to such an inquiry under this court's case in Sugarnova v. Holder. Now, contrary to petitioner's assertion, the agency did not solely rely on the affidavit. It relied on six different factors. First, the fact that the marriage had been entered after the couple had known each other for only a short of time, what the USCIS officer referred to as a rapid sequence of events. Second, petitioner's ex-husband's admissions and statements to the USCIS fraud officer, which were statements against penal interest, and that he received $1,200 in visa fees funding in exchange for marrying her. Third, the evidence that the couple traveled together to the United States separately, flew to separate cities in separate states, and never lived together. That's not in dispute. Fourth, conflicting and inconsistent testimony from both regarding whether they ever visited one another, whether petitioner's family ever paid the ex-husband any money before or after the marriage. Fifth, conflicting information regarding whether they ever lived as husband and wife and consummated the relationship. And to that, I would just add that contrary to if you look at the actual interview that was conducted by the USCIS fraud investigator, he never even used the word consummated. He asked an open-ended question about whether the couple, while they were in Nigeria, had ever slept in the same bed together. And to which the petitioner's ex-husband said, no, we never. And then he said, never what? Had sex? And he said, no, we never had sex. So there shouldn't be any confusion about what that Sixth, there was, and most importantly, there's zero documentary evidence of this couple ever having established a life together. And I, you know, maybe it's 10 years, but there should be something. Property records, you know, I'm drawing a blank on what, property records, affidavits from family and friends, utility bills, joint bank accounts, tax returns, something establishing an intent by the couple to establish a life together as a married couple once they were in the United States. Both testified, in fact, that they never saw each other. In fact, three years went by between when they last saw each other and filed for divorce. And it was just prior to petitioner's ex-husband, his naturalization, that he decided to finally get divorced, presumably so that he could marry his second wife that he had intended to marry all along with whom he had a child. So under these circumstances, the record evidence supports the agency's decision, certainly does not compel a contrary result. Now, with respect to petitioner's contention that her ex-husband's testimony was obtained under duress, if you look at the actual transcript of the interview, which petitioner herself submitted to the immigration judge, the evidence from that transcript just does not bear out these arguments. There is no threat of deportation. In fact, the officer in multiple instances makes sure that petitioner's ex-husband is aware of the fact that he's not putting him under arrest. He doesn't even have the authority to approve or deny the application. The most he can do, he says on multiple occasions, is make a recommendation. And the fact is, he tells him, the more open and forthcoming you are with me, the sooner you stop lying, the less time it will take to process your application. That's all he says. And so the effort of questioning him, as he knows, he came into the interview, they'd already had documentary evidence suggesting that this was not a bona fide marriage. The purpose of the fraud interview is to find out what's going on. And the more an applicant is evasive and doesn't want to answer questions or stammers, then the more an officer is going to press for that information that he needs. And what he says to petitioner's ex-husband is absolutely true, that the more you lie, the more it's going to take longer to process his naturalization application and to process any further visas that he wants to file on behalf of current wife and son. Now, the reason why you might get a different result, the issue with respect to his naturalization was whether or not he's lying to an officer or if he's ever lied. On a naturalization application, an applicant is specifically asked two different places, whether you've ever aided in somebody coming to the United States illegally, and whether you've lied to an officer of the court or to an immigration officer. It's likely that because there was evidence that both of those questions were answered incorrectly, that would indicate, that would prompt a fraud investigation. That doesn't, but that goes to whether he's eligible for naturalization. It wouldn't necessarily mean that he's removable as someone who procured an immigrant visa by fraud or misrepresentation, nor would it indicate that his subsequent visas that he filed for his current wife and son were invalid. It would certainly prompt further investigation because if you're found to have engaged in a fraudulent marriage once, then it's not unfair to question the validity of any subsequent marriage. So that's just, if I could just clear up why, you know, if there's any confusion or concern about the fact that petitioner's ex-husband didn't get removed for his conduct, she is removable for her conduct because the fraudulent marriage was material to her eligibility as a derivative applicant on the diversity visa. Do you take it as odd in the least that Festus removed or received citizenship? I'm sorry, I didn't hear the end of your question, Your Honor. I wondered if you find it in the least bit unusual that Festus receives, not only does he receive citizenship, his wife and child do as well. You know, correction, Your Honor. There's nothing in the record indicating that her ex-husband in fact received citizenship. That's what I was trying to explain. They're two different issues. It's possible that he did not receive citizenship, but that in of itself wouldn't make him removable and it wouldn't make the petitions for his subsequent wife and child invalid or not qualifying. Well, where is he in the system? Okay, where is he? I don't have that information, Your Honor. I'm sorry. Oh. I believe, I mean, I know that his proceedings were terminated, which means that he's probably no longer, I mean, it's possible, and this is all off the record, outside the record, you know, it's possible that he's retained his permanent residency and is just, you know, living life. I don't have any, there's no record of him being removed. So, like I said, this all happened to him in the context of a naturalization application, which is a separate office adjudicating than people who decide if other, you know, someone else related to that application is removable for a different thing. But he's not in removal proceedings at this point, I take it? Not that I'm aware of, Your Honor, no. Yeah. Huh. So, and, you know, setting that issue aside, we're still left with these inconsistencies within the hearing itself that was appropriate for the judge to rely on, with respect to, you know, whether they visited one another in the United States, whether there was money exchanged, you know, the petition was very clear on her brother having given her ex-husband money on two different occasions, and he's, you know, recanted his testimony that he'd received anything, you know, and, you know, her statement that she had, that she had gone out to California for one month and tried to work things out, and then came back, he contradicted that and said, no, he never, she never came to visit him, and he never went to see her. So, I think, you know, certainly that's enough to sow doubt. And then when you look at, you know, the lack of documentary evidence, I think, you know, this was just not a valid marriage. There was no intent to establish a life together, certainly not, you know, on the, on this record. So, I see I'm out of town, out of time tonight. You're also out of town. All right. Thank you, Ms. Browning. Thanks to both counsel and the cases taken under advisement.